No. 77–5874. LITTLE v. ARKANSAS. Sup. Ct. Ark. Certiorari denied.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

I would grant certiorari to resolve the question whether, before a juvenile waives her constitutional rights to remain silent and consult with an attorney, she is entitled to competent advice from an adult who does not have significant conflicts of interest.

Petitioner, a girl of "low dull normal" intelligence,[1] has been sentenced to spend the rest of her life in prison for a crime that occurred when she was 13 years old.[2] Her conviction for the murder of her father was based in large part on incriminating statements that she made on three occasions. The most important of these statements was a lengthy confession given at the county juvenile home on the day of the murder, in the presence of her mother, a probation officer, a prosecuting attorney, and two sheriff's deputies.

Prior to making this confession, petitioner spent 10–15 minutes alone with her mother, who had earlier been questioned by the police concerning the murder and who believed that she was herself a suspect. 261 Ark. 859, 866–867, 554 S. W. 2d 312, 314–315 (1977). The mother emerged from this meeting, "look[ing] as if she had been crying," and stated

---

[1] 261 Ark. 859, 870, 554 S. W. 2d 312, 317 (1977). The psychiatrist who made this observation had been called by the State at a pretrial hearing on petitioner's suppression motion. He also stated that petitioner had "basic insecurity and inadequacy" and that she was "fearful of doing the wrong thing." *Ibid.*

[2] The opinion of the Arkansas Supreme Court suggests at one point that petitioner might have been 14 years old, *id.,* at 863, 554 S. W. 2d, at 313, but assumes at another point that petitioner was 13, *id.,* at 876, 554 S. W. 2d, at 320–321. The State here concedes that petitioner was 13. Brief in Opposition 5.

that petitioner wanted to confess. *Id.,* at 867, 554 S. W. 2d at 315. Petitioner then was advised of her rights under the Fifth and Sixth Amendments, pursuant to *Miranda* v. *Arizona,* 384 U. S. 436 (1966).[3] She said that she understood her rights and wished to talk. Her confession was tape-recorded and, along with testimony concerning petitioner's other self-incriminating statements,[4] was introduced at trial over timely objection. Petitioner's subsequent conviction was affirmed by the Arkansas Supreme Court.

The issue presented here is an important one. In *In re Gault,* 387 U. S. 1 (1967), this Court recognized that "special problems may arise with respect to waiver of the [Fifth Amendment] privilege by or on behalf of children" and that "the greatest care must be taken to assure that . . . [a child's confession] was not the product of ignorance of rights or of adolescent fantasy, fright or despair." *Id.,* at 55. Several years earlier, in *Gallegos* v. *Colorado,* 370 U. S. 49 (1962), the Court observed that "a 14-year-old boy, no matter how sophisticated, . . . is unable to know how to protect his own interests or how to get the benefits of his constitutional rights." *Id.,* at 54. In both of these cases, convictions of

---

[3] Petitioner had been given *Miranda* warnings at least once prior to this time, see n. 4, *infra,* and her rights had been separately explained to her mother, 261 Ark., at 866–867, 554 S. W. 2d, at 315.

[4] Petitioner had earlier stated, while being taken to the juvenile home by deputy sheriffs, that she had " 'done it.' " *Id.,* at 866, 554 S. W. 2d, at 315. It is not clear whether this brief statement was made spontaneously or in response to questioning by the sheriffs. Compare *ibid.,* with *id.,* at 872, 554 S. W. 2d, at 318. *Miranda* warnings had been given before petitioner spoke.

The final set of statements made by petitioner and used against her were made at a juvenile home where petitioner was held for several months. She developed a close relationship with a "house mother," who later testified that petitioner had admitted to her that petitioner had committed the crime partly out of fear of her father's sexual advances. *Id.,* at 872–873, 554 S. W. 2d, at 318. There is no indication that the house mother ever advised petitioner of her rights.

juveniles were reversed, in part because they had not had an opportunity to consult with a relative or lawyer prior to confessing. See 387 U. S., at 56; 370 U. S., at 54.[5]

Requiring that a child receive adult advice before making a confession ensures that the child is protected from "his own immaturity," thereby "put[ting] him on a less unequal footing with his interrogators. *Ibid.*[6] Petitioner here did consult with her mother before she made her statement. The mother, however, was plainly not in a position to provide rational advice with only the child's interests in mind, especially on the day of the murder. The mother had been through the traumatic experience of having her husband shot while he slept next to her, and then had suffered the additional trauma of believing herself to be a suspect, see *supra,* at 957. Like her daughter, the mother had been given tranquilizers not long before the confession was made. 261 Ark., at 869–872, 554 S. W. 2d, at 316–318. The mother's testimony indicates understandable confusion and incomprehension at the time her daughter's rights were explained to her:

"I didn't know what to do. I didn't have nobody there with me, and being under this shock, and then them

---

[5] See also *Haley* v. *Ohio*, 332 U. S. 596, 599–600 (1948):

"[W]hen, as here, a mere child—an easy victim of the law—is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. . . . [W]e cannot believe that a lad of tender years is a match for the police in such a contest. He needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, crush him."

[6] Many state courts have required that a child receive competent parental or other adult advice before waiving constitutional rights. See, *e. g., Lewis* v. *State*, 259 Ind. 431, 436–440, 288 N. E. 2d 138, 141–143 (1972); *In re K. W. B.*, 500 S. W. 2d 275, 279–283 (Mo. App. 1973); *Commonwealth* v. *Webster*, 466 Pa. 314, 320–328, 353 A. 2d 372, 375–379 (1975). See also *Weatherspoon* v. *State*, 328 So. 2d 875, 876 (Fla. App. 1976).

coming and picking her up, and I was sedated, she was sedated. . . . I was trying to make funeral arrangements. . . . I didn't know. I'd never been through a shock like this." Tr. 172, 173, 175–176.

Under the circumstances, it is hardly surprising that the mother cried when she was supposed to be giving dispassionate advice, see *supra,* at 957–958, and then urged her daughter to confess, 261 Ark., at 869, 554 S. W. 2d, at 316.

We recognized in *Gault* that the "competence of parents" is a relevant factor in determining the validity of a waiver of rights by a child. 387 U. S., at 55. When the parent is emotionally distraught, crying, and under the influence of drugs, not only is her advice likely to be less than "competent," but the parent's demeanor may well have an adverse effect on the child's ability to make a knowing waiver of her own rights. And to uphold a child's waiver on the ground that she received parental advice is surely questionable when the parent has two obvious conflicts of interest, one arising from the possibility that the parent herself is a suspect, and the other from the fact that she is "advising" the person accused of killing her spouse.

The difficulties inherent in a situation like that presented here have been recognized by lower courts and commentators. See, *e. g., McBride* v. *Jacobs,* 101 U. S. App. D. C. 189, 190, 247 F. 2d 595, 596 (1957) (parent may waive child's rights if waiver is "intelligent [and] knowing" and "there is no conflict of interest between them"); *Daniels* v. *State,* 226 Ga. 269, 273, 174 S. E. 2d 422, 424 (1970) (mother intoxicated; *Gault* requires "competent, sober mother"); *Ezell* v. *State,* 489 P. 2d 781, 783–784 (Okla. Crim. App. 1971) (confession inadmissible despite presence of mother and legal guardian; no showing that either was "capable of protecting defendant's constitutional rights"); *In re L. B.,* 33 Colo. App. 1, 4, 513 P. 2d 1069, 1070 (1973) (father, incarcerated on drunkenness and other charges, taken from cell to advise son; parent's "mere physical

presence" is not sufficient) ; Institute of Judicial Administration & American Bar Assn., Joint Commission on Juvenile Justice Standards, Standards Relating to Police Handling of Juvenile Problems 69–73 (tent. draft 1977) ; Note, 57 B. U. L. Rev. 778, 783, 787–788 (1977).

Under all of the circumstances, petitioner's contention that there was no valid waiver of her rights deserves this Court's plenary consideration. At the time that she made the decision to confess, this girl of "low dull normal" intelligence was not old enough, according to state law, to make decisions for herself on such other matters as marriage, voting, drinking alcoholic beverages, entering into an enforceable contract, initiating a lawsuit, and remaining in school.[7] Her mother was hardly in a position to act on petitioner's behalf on the day of the confession, as discussed above. In view of our reaffirmation only last Term that courts must "indulge in every reasonable presumption against waiver," *Brewer* v. *Williams,* 430 U. S. 387, 404 (1977), I would grant the petition for certiorari.

---

[7] Ark. Stat. Ann. § 55–102 (Supp. 1977) ; Ark. Const. Art. 3, § 1, Ark. Stat. Ann. § 3–212 (1976) and §§ 48–902.1 to 48–903.2 (1977) ; *Robertson* v. *King,* 225 Ark. 276, 278–279, 280 S. W. 2d 402, 403–404 (1955) ; Ark. Stat. Ann. § 27–823 (1962) and § 80–1502 (1960). In addition, a child of petitioner's age in Arkansas may not, *inter alia,* give blood or obtain a tattoo without parental consent, §§ 82–1606 (Supp. 1977), 41–2468 (1977) ; play cards in a "saloon," § 41–2459; "frequent" any "pool-hall," § 41–2461; or operate a motor vehicle, §§ 75–310, 75–324 (Supp. 1977).